IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JOHN DOE 4, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 14-CV-674-NJR-DGW |
| | ) | |
| FREEBURG COMMUNITY CONSOLIDATED SCHOOL DISTRICT NO. 70, HERSCHEL PARRISH, CLARENCE HAEGE, LAWRENCE MEGGS, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff John Doe 4 attended school in the Freeburg Community Consolidated School District No. 70 ("the School District") for sixth, seventh, and eighth grade. Plaintiff alleges that during that time a long-time employee of the School District, Robin Hawkins, sexually groomed, harassed, and abused him at school on a number of occasions. Plaintiff further alleges that Hawkins previously abused other boys, and a number of reports regarding the abuse were made to the School District, but the School District failed to take appropriate corrective action. In other words, according to Plaintiff, the School District knew that Hawkins was a sexual predator but chose not to stop him, and as a result, Plaintiff became yet another one of his victims. Plaintiff filed this action to recover damages from the School District and three former school officials for the abuse he allegedly suffered (Doc. 2).

Currently pending before the Court is a motion filed by Plaintiff seeking summary judgment on Count 1, which is his claim for discrimination under Title IX against the School District (Doc. 90). Defendant filed a timely response in opposition to the motion for summary judgment (Doc. 91), to which Plaintiff filed a reply (Doc. 92). The Court has carefully considered the briefs submitted by the parties, and for the reasons set forth below, the motion is granted.

## FACTS

Robin Hawkins began his career with the Freeburg Community Consolidated School District No. 70 ("the School District") in 1977 (Doc. 90). He spent sixteen years, from 1977 to 1993, as a teacher, counselor, basketball and track coach, and student council sponsor (*Id.*). During that time, Lawrence Meggs served as assistant superintendent, and Clarence Haege was the superintendent (*Id.*). When Haege retired in 1994, Meggs was promoted to superintendent, and Hawkins was promoted to principal and assistant superintendent (*Id.*). Once Meggs retired in 1998, Hawkins became superintendent and served in that capacity until May 2009, when he committed suicide (*Id.*). Following Hawkins's suicide, Meggs once again served as superintendent on an interim basis from May 2009 to January 2010 (*Id.*). Herschel Parrish was a member of the school board from 1981 to 2009, and he served as president from 1992 to 2009 (*Id.*).

In the fall of 2006, Plaintiff John Doe 4 began attending Carl L. Barton Elementary School, which is operated by the School District, as a sixth grader (Doc. 90-1). At that time, Robin Hawkins was the superintendent of the School District (*Id.*). According to Plaintiff's deposition testimony, Hawkins began to befriend him as soon as he arrived in

the School District (*Id.*). He would be sent to Hawkins's office for disciplinary reasons or would occasionally go to his office just to talk (*Id.*). While he was in sixth grade, Hawkins began asking Plaintiff questions of a sexual nature (*Id.*). The conversations occurred in Hawkins's office with the door closed (*Id.*; *see also* Doc. 90-14). They would sit with their knees interlocked, with Hawkins's knee touching Plaintiff's crotch (*Id.*). Hawkins would rub Plaintiff's leg and pat him on the butt when he left (*Id.*).

Plaintiff testified that during the spring of 2008, his conversations with Hawkins turned to masturbation (Doc. 90-1). Hawkins showed Plaintiff how to masturbate by doing it to himself, but then Hawkins progressed to masturbating Plaintiff (*Id.*). During the spring and summer of 2008, the acts of masturbation occurred multiple times during the school day (or just after school) in Hawkins's office with the door closed (*Id.*).

The abuse progressed even further during the last week of summer school in 2008. According to Plaintiff, Hawkins took him to the locker room beneath the stage in the old gym, where they masturbated each other (Doc. 90-1). Hawkins then asked Plaintiff if he would try new things, and Plaintiff performed oral sex on Hawkins, and Hawkins anally penetrated Plaintiff (*Id.*) During the fall of 2008, Hawkins and Plaintiff spoke on a daily basis; Hawkins would ask about Plaintiff's sexual activities, and they continued to engage in mutual masturbation in Hawkins's office (*Id.*). The sexual abuse ceased in early 2009 (*Id.*).

It turns out that Plaintiff is not the first student to claim that Hawkins sexually abused him when he was a junior high student. A number of other male students have come forward, and their claims illustrate that Hawkins purportedly began sexually

abusing male students as far back as 1980 and continued to do so throughout the entire course of his career in the School District.

First, a male student, referred to here as B.S., claims Hawkins sexually abused him beginning in 1980 when he was in Hawkins's social studies class (Doc. 90; Doc. 90-3). Specifically, B.S. alleges Hawkins would call him up to his desk during class, B.S. would sit in a chair, and Hawkins would run his hand up B.S.'s leg and "play with [his] balls" (*Id.*). B.S. claims he told the assistant superintendent, Lawrence Meggs, on more than one occasion that Hawkins was fondling him, which Meggs denies (Doc. 90; Doc. 91; Doc. 90-3; Doc. 90-4).

Another male student, referred to here as B.B., also claims that Hawkins fondled him during social studies class during the 1981-1982 and the 1982-1983 school years (Doc. 90; Doc. 90-5). While B.B. was in eighth grade or shortly thereafter, either he or his parents told family friend Wayne King about the abuse (Doc. 90; Doc. 90-5; Doc. 90-6). King was a PE teacher in the School District (Doc. 90; Doc. 90-5; Doc. 90-6). King watched Hawkins for a time, but did not see anything inappropriate (Doc. 90; Doc. 90-6). King did not report B.B.'s complaint to any school administrators or the school board at that time (Doc. 90; Doc. 90-6).

In 1991, a sixth grade student, referred to here as A.M., came forward with a complaint that he was being sexually abused by Hawkins (Doc. 90; Doc. 90-7). According to A.M., Hawkins took him into the locker room of the old gym, blindfolded him, tied him up, and told him that a girl would come in and give him oral sex (Doc. 90; Doc. 90-7). A.M. could see under the blindfold, however, that he was receiving oral sex

from Hawkins, not a girl (Doc. 90; Doc. 90-7). This occurred on more than five occasions (Doc. 90; Doc. 90-7).

A.M. told his parents about the abuse, who in turn notified the superintendent, Clarence Haege (Doc. 90; Doc. 91). Haege then relayed the accusation to Lawrence Meggs, and together they notified the school board (Doc. 90; Doc. 91). Haege also notified both the Freeburg Police Department and the Department of Children and Family Services ("DCFS"), who investigated A.M.'s allegations (Doc. 90; Doc. 91). As part of the police department's investigation, Wayne King was questioned; King testified that, following the questioning, he informed Meggs that B.B. had previously disclosed that he was sexually abused by Hawkins (Doc. 90-6). Meggs denies that King told him about B.B. at the time of the investigation into A.M.'s allegations; instead, according to Meggs, King told him about B.B. sometime around 2000 (Doc. 91-2). At that time, King and Meggs were no longer employed by the School District, but Hawkins was (Doc. 91-2).

The Freeburg Police Department and DCFS determined that A.M.'s allegations of abuse were unfounded (Doc. 91; Doc. 91-2; Doc. 91-7). Haege and Meggs still harbored suspicions, however, so they conducted their own investigation (Doc. 90; Doc. 90-4; Doc. 90-8; Doc. 91). They searched the locker room with a black light, took samples of a brown patch that was analyzed by the police department and determined to be varnish, and ordered the janitor to search the old gym for whatever he could find (Doc. 90; Doc. 90-4; Doc. 90-8; Doc. 90-9). It does not appear that anything came of their investigation (*see* Doc. 90; Doc. 91-3).

In 1999, school board member Dolly Revelle was at her grandson's preschool graduation and learned of allegations that Hawkins had abused another male student, referred to here as T.B. (Doc. 90; Doc. 91). Revelle spoke with T.B.'s mother and then met with T.B., who told her he was abused by Hawkins beginning in 1982 (Doc. 90; Doc. 90-10; Doc. 90-11; Doc. 91). Specifically, T.B. claims that he had conversations with Hawkins on more than twenty occasions in which Hawkins asked for details regarding T.B.'s sexual experiences with a fellow male classmate (Doc. 90-10). T.B. also recalls occasions in the classroom where he would sit in front of Hawkins, and Hawkins would rub T.B.'s leg, crotch, and penis (Doc. 90-10). Revelle contacted Herschel Parrish, the school board president, told him about the allegations, and indicated that she thought the allegations were credible (Doc. 90-2; Doc. 90-11).[1]

The school board then held a special, closed meeting in June 2000, where Ms. Revelle shared the information she had learned from T.B. (Doc. 90; Doc. 90-12). The school board was unsure how to handle the situation because the information involved a former student (as opposed to a current student), and it was coming second-hand through Ms. Revelle and not from the former student himself (*see* Doc. 90-12). The school board decided to do a "limited investigation" (Doc. 90; Doc. 90-12; Doc. 91; Doc. 91-4, p. 9). That means, instead of calling the police or DCFS, the school board hired an attorney to investigate the allegations to determine whether the board needed to report anything to the authorities (Doc. 90-2; Doc. 90-12). The attorney's investigation consisted only of interviewing Robin Hawkins and Dolly Revelle (Doc. 90; Doc. 90-2, pp. 22, 25–26,

---

[1] It is not clear when exactly Dolly Revelle spoke to Herschel Parrish. It might have been before she met with T.B., after she met with T.B., or both (*see* Doc. 90-11; Doc. 90-2; Doc. 91-4). Both Revelle and Parrish agree, however, that Revelle told Parrish about T.B.'s allegations (*see* Doc. 90-11; Doc. 90-2).

27). Notably, although Parrish knew of A.M.'s previous allegations of sexual abuse by Hawkins, he did not share that information with the school board or with the investigative attorney (Doc. 90; Doc. 90-2, pp. 22, 25–26). Based on the results of that investigation, the school board decided not to pursue T.B.'s allegations any further or to report them to authorities (Doc. 90; Doc. 90-2, p. 29).[2]

Another male student, referred to here as J.W., alleged that he was sexually abused by Hawkins between 1978 and 1981 (Doc. 90-13). Specifically, J.W. claims that Hawkins offered to arrange meetups between J.W. and other students struggling with their sexual orientation (*Id.*). Hawkins would blindfold J.W. and leave the room, and then someone would come in and perform oral sex on J.W. (*Id.*). J.W. knew that Hawkins was actually the one performing the oral sex (*Id.*). This occurred on more than twenty occasions in a room between Hawkins's office and the library and in the locker room under the stage in the old gym (*Id.*)

J.W. claims that he told Clarence Haege about the abuse sometime between 1992 and 1998 (Doc. 90-13). Haege claims it was sometime after Hawkins became superintendent, however, which was in 1999 (Doc. 90-8). Haege then approached Herschel Parrish, the president of the school board, and explained the details of J.W.'s abuse and remarked that J.W.'s allegations were very similar to A.M.'s allegations. (Doc. 90-8). According to Haege, he gave J.W.'s name and phone number to Parrish so

---

[2] Defendant asserts that "[f]ollowing the completion of the investigation, the School Board was informed that no action had to be taken with regards to [T.B.'s] allegations because he was not a current student at the School District" (Doc. 91, p. 11). In support of that assertion, Defendant cites to page 126 of Herschel Parrish's deposition, which is located at Doc. 91-4, p. 9. The Court reviewed that page of the deposition, and the testimony does not state what Defendant claims. It does not explicitly state or implicitly suggest that the Board was told they did not have to take any action because T.B. was no longer a student in the School District.

that Parrish could contact J.W. (*Id.*). For his part, Parrish testified that Haege came to him sometime shortly after the conclusion of the investigation into T.B.'s complaint, which would have been in 2000 (Doc. 90-2). Parrish claims Haege did not give him a name, and Parrish simply "assumed" that this complaint was also involved T.B. (Doc. 90-2). But Parrish did not make any effort to determine if his assumption was correct (Doc. 90; Doc. 90-2, p. 19). He never attempted to find out who the boy was or to contact him (Doc. 90; Doc. 90-2, pp. 14–19; Doc. 91-4, pp. 6–8). He never reported the allegations to DCFS or to the school board (Doc. 90; Doc. 90-2, p. 19). And he never documented the report anywhere (Doc. 90-2, p. 18).

## DISCUSSION

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is appropriate where the admissible evidence shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. A "material fact" is one identified by the substantive law as affecting the outcome of the suit. A "genuine issue" exists with respect to any such material fact . . . when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." On the other hand, where the factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is nothing for a jury to do. In determining whether a genuine issue of material fact exists, we view the record in the light most favorable to the nonmoving party.

*Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citations omitted).

"Title IX prohibits discrimination on the basis of sex in educational programs or activities that are supported by federal financial assistance." *Hansen v. Bd. of Trustees of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 604 (7th Cir. 2008) (citing 20 U.S.C. § 1681(a)). "[A]

teacher's sexual harassment [or abuse] of a student may render a school district liable for sex discrimination under Title IX." *Hansen*, 551 F.3d at 605 (citation omitted). A school district's liability cannot, however, be premised on the ground of *respondeat superior* or negligence. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642 (1999)); *Doe v. St. Francis Sch. Dist.*, 694 F.3d 869, 871 (7th Cir. 2012) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998)). Instead, the school district can only be held liable where it is deliberately indifferent to known acts of sexual misconduct by a teacher. *Davis*, 526 U.S. at 642; *Hansen*, 551 F.3d at 605. Accordingly, the plaintiff must prove that "an official of the school district who at a minimum has authority to institute corrective measures . . . ha[d] *actual notice* of . . . the teacher's misconduct" and that the official "acted with deliberate indifference to the misconduct." *Hansen*, 551 F.3d at 605 (citing *Gebser*, 524 U.S. at 277). The student also must show that the school district had "substantial control over both the harasser and the context in which the known harassment occurs." *Doe-2 v. McLean Cty. Unit Dist. No. 5 Bd. of Directors*, 593 F.3d 507, 512 (7th Cir. 2010) (quoting *Davis*, 526 U.S. at 645).

Here, the parties do not make any argument as to whether the School District had the requisite control over Hawkins's abuse of male students (*see* Docs. 90, 91). There can be no doubt that the School District had substantial control over the harasser and the context in which the harassment occurred, however, because the abuse was perpetrated by a school employee during school hours and on school grounds, *see Davis*, 526 U.S. at 646. That leaves only the issues of actual notice and deliberate indifference.

*Actual Notice*

The Seventh Circuit has explained that the "actual notice" requirement of a Title IX claim necessitates the plaintiff proving "actual knowledge of misconduct, not just actual knowledge of the risk of misconduct." *Doe v. St. Francis Sch. Dist.*, 694 F.3d 869, 871 (7th Cir. 2012) (citing *Hansen v. Board of Trustees,* 551 F.3d 599, 605 (7th Cir. 2008)). Additionally, "a school district need not possess actual knowledge of a teacher's acts directed at a *particular plaintiff,* but it must still have actual knowledge of misconduct that would create risks 'so great that they are almost certain to materialize if nothing is done.'" *Hansen,* 551 F.3d 599 (citing *Delgado v. Stegall*, 367 F.3d 668, 672 (7th Cir. 2004)) (emphasis in original). In other words, "if a teacher had been known to be a 'serial harasser,' a school district might be found to have actual knowledge of that teacher's misconduct." *Hansen*, 551 F.3d at 599 (citing *Delgado*, 367 F.3d at 672). In determining whether school officials had actual knowledge, courts "have focused on reports or observations in the record of inappropriate behavior." *Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003) (citations omitted).

Here, there can be no doubt that school officials had actual knowledge of Hawkins's purported misconduct with minor male students well before anything happened to Plaintiff. There are *at least* five males who claim they informed school officials that they were sexually abused by Hawkins while they were students in the School District (*see* Doc. 90). While school officials dispute a couple of the men's accounts, they do not dispute the others (*see* Doc. 91). For instance, it is undisputed that in 1991, A.M. and his father informed Clarence Haege, the superintendent of the school,

that Hawkins had sexually abused A.M. (Doc. 90-8; Doc. 91). Haege in turn informed Lawrence Meggs, and the entire school board and the authorities investigated A.M.'s complaint (Doc. 90-8). It is also undisputed that in 1999, T.B. informed Dolly Revelle, a member of the school board, that he was sexually abused by Hawkins when he was a student in the early 1980s (Doc. 90-11). Ms. Revelle then told Herschel Parrish, the president of the school board, and the school board undertook a limited investigation of the allegations (Doc. 90-11). Finally, it is undisputed that J.W. told Clarence Haege sometime in the 1990s that he was sexually abused by Hawkins (Doc. 90-8, Doc. 91). Haege, who was retired from the school district at the time, reported the allegations to Herschel Parrish, the president of the school board (Doc. 90-8, Doc. 91).

Based on this evidence, no rational trier of fact could find for the School District on the issue of actual notice. Thus, the Court concludes as a matter of law that school officials had actual knowledge of Hawkins's alleged misconduct and the risk he posed to male students before Plaintiff became a student in the School District in 2006. That leaves the issue of whether school officials acted with deliberate indifference to Hawkins's misconduct.

*Deliberate Indifference*

Deliberate indifference occurs when "the response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999)). *See also Delgado v. Stegall*, 367 F.3d 668, 671 (7th Cir. 2004) ("Deliberate indifference means shutting one's eyes to a risk one knows about but would prefer to ignore.") The deliberate indifference must, "at

a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Davis*, 526 U.S. at 645. "In an appropriate case, there is no reason why courts, on a motion . . . for summary judgment . . . could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649.

This is such a case. By the time Plaintiff became a student in the School District in 2006, school officials knew that Hawkins had been accused three times within a roughly ten year span of sexually abusing male students on school premises during school hours. Based on those accusations, school officials also knew that Hawkins's misconduct had purportedly escalated through the years from inappropriate conversations to fondling to oral sex. When the first complaint, which was made by A.M., came to light, school officials were promptly notified, and the police and DCFS also became involved and investigated. But with the second complaint, pertinent information was withheld from the school board when they were deciding how to handle T.B.'s allegations. Specifically, the president of the board was aware of A.M.'s previous complaint of sexual abuse but he did not share that complaint with the other board members. The board ultimately opted to hire an attorney to conduct a limited investigation into T.B.'s allegations, as opposed to notifying the authorities. For some unfathomable reason, the investigating attorney was not informed about A.M.'s previous complaint. Based on the attorney's investigation, which cannot be described as anything other than cursory, the board decided not to report the allegations to the authorities.

The record before the Court also demonstrates that school officials did absolutely *nothing* beyond investigating the first two complaints. The School District took no action

to monitor the situation with Hawkins or to implement protective measures. For example, nothing was done to supervise or check in on Hawkins, to limit his access to certain areas of the school, or to limit his access to students. Given the evidence that Hawkins routinely met with male students in his office behind a closed door, he apparently wasn't even admonished not to be alone with students or to leave his door open. The School District also did not make any efforts to communicate any precautions or educational materials to parents and students to help them identify inappropriate conduct and to know how to report it.

As for the third complaint made by J.W., it was essentially disregarded. The school board president did not document the report, he did not contact the other school board members or school administrators, and he did not contact the authorities. Absolutely no effort was made to investigate the allegations, let alone to take additional steps to prevent further misconduct by Hawkins. *See Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 654 (1999) (holding that actual knowledge and deliberate indifference can be shown where school officials "made no effort whatsoever either to investigate or to put an end to the harassment.") Consequently, students like Plaintiff remained vulnerable to sexual abuse by Hawkins.

Based on these facts, the Court finds that the response of school officials to all three complaints of sexual abuse was clearly unreasonable in light of the known circumstances. At a minimum, the complete lack of a response by school officials to J.W.'s complaint was clearly unreasonable, and a rational factfinder could not conclude otherwise. It amounted to an "official decision . . . not to remedy" the situation. *Gebser v.*

*Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). Thus, the Court finds as a matter of law that school officials were deliberately indifferent to a known acts of sexual abuse by a teacher. Consequently, Plaintiff is entitled to summary judgment on Count 1 for discrimination under Title IX against the School District.

## CONCLUSION

For the reasons set forth above, Plaintiff John Doe 4's motion for summary judgment on Count 1 (Doc. 90) is **GRANTED**.

**IT IS SO ORDERED.**

DATED:   September 1, 2017

                                          *Nancy J. Rosenstengel*
                                       _____
                                       **NANCY J. ROSENSTENGEL**
                                       **United States District Judge**